**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **No. 06cv1246** |
| **OPPORTUNITY COMMISSION,** | : | |
| **ARLENE ANDERSON,** | : | **(Judge Munley)** |
| **CAROLYN BLOCKUS,** | : | |
| **LAURA FIGUEROA,** | : | |
| **DEBORAH GDOVIN,** | : | |
| **PATRICIA PAVALONIS, and** | : | |
| **YVONNE PRYWARA,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHOTT NORTH AMERICA, INC.** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Before the court is defendant's motion for summary judgment (Doc. 42) in this employment discrimination case. Having been fully briefed and argued, the matter is ripe for disposition.

## I. Background

This case grows out of an October 2004 reorganization and subsequent layoff of employees at Defendant Schott North America's specialty glass plant in Duryea, Pennsylvania. (Defendant's Statement of Material Facts in Support of Summary Judgment (hereinafter "Defendant's Statement") (Doc. 43) at ¶ 1).[1] Employees at

---

[1] The court will cite to defendant's statement of material facts for those statements which are undisputed. Where the facts are disputed, the court will note that.

the plant were represented by the United Food and Commercial Workers Union, and a collective bargaining agreement covered production employees at the time of the layoffs.  (Id. at ¶ 4).  The six intervenor plaintiffs all worked in the plant prior to October 2004 and filed discrimination charges against the company with the EEOC.  (Id. at ¶ 6).  The EEOC represents five other plaintiffs who did not file discrimination charges with the agency: Lori Zielinski, Linda Stoss, Margaret Moran, Sally Guzik and Jean Donovan.  (Id. at ¶ 9).

Before October 2004, the Duryea plant produced two types of glass: optical and opthalmic.  (Id. at ¶ 10).  Optical glass is produced in large strips or blocks and is used in a variety of products, which are often part of military, industrial, medical and aerospace systems.  (Id. at ¶ 11).  Opthalmic glass is most commonly used for eyeglass lenses.  (Id. at ¶ 12).  Producing each of these types of glass requires much different production processes and different levels and types of staffing.  (Id. at ¶ 13).

Glass production on a continuous production line was generally divided into two parts before the plant's reorganization in October 2004.  (Id. at ¶ 14).  First, the product went through the "hot end," where raw chemicals that produce gas were loaded into continuous melting tanks (furnaces) of several hundred liters, melted at extremely high temperatures, "hot formed" into the required product geometry and thermally treated to remove stress.  (Id.).  This process took place in an annealing oven (lehr), which also provided for the cooling of the glass to room temperature.

(Id.).  After passing through this hot end, the glass proceeded to the "cold end,"

where it was inspected and packaged.  (Id. at ¶ 15).

The parties disagree about the amount of attention required by workers in the

"hot end" of the opthalmic glass-making process.  (Id. ¶ 16; Plaintiff EEOC's

Response and Objections to Defendant's Statement of Facts (hereinafter "EEOC's

Response") at ¶ 16).  Defendant contends that "the 'hot end' forming equipment

requires close and continuous monitoring to assure that the glass consistently

remains in dimensional tolerance by controlling appropriate temperatures, pressures,

speed, timing, etc. of the forming press."  (Defendant's Statement at ¶ 16).  Plaintiff

EEOC points to the testimony of Thomas Luder, who was a hot-end foreman for 27

years and worked at Schott for 30 years.  (EEOC's Response at ¶ 16).  According to

Luder, once the hot end work was properly set up by the group leader "the work of

the operator was minimal."  (Id.).  The EEOC points to evidence that hot end workers

could take longer breaks than cold end workers, that the workers on the hot end

would often sit on chairs reading magazines, and that they sometimes fell asleep

while sitting in chairs, requiring foremen to wake them up.  (Id.).  Workers testified

that they saw hot end workers reading newspapers and books, eating, working

puzzles and playing poker machines while at work.  (Id.).

"Cold end" work was of a different sort, requiring more constant, continuous

attention to detail.  (Defendant's Statement at ¶ 17).  Plaintiffs point to evidence that

this work was "fast" and "non-stop, and argues that the work was extremely "critical,"

3

since workers at the "cold end" inspected glass that went directly to customers. (EEOC's Response at ¶¶ 17-18).

Production of optical glass used a different process that arguably required different sets of skills. (Defendant's Statement at ¶ 20). Not as much attention to process was required on either end of the line. (Id.). An operator making the "strip glass" associated with optical glass, defendant argues, had several minutes between processes, which allowed for monitoring of both the hot and cold end. (Id. at ¶ 21). The parties disagree about the complexity of the cold end inspection process for optical glass. (Id. at ¶ 21-22; EEOC's Response at ¶¶ 21-22). Defendant contends that the process is simpler than for opthalmic glass and requires fewer individual tasks or skills. (Id. at ¶ 22). Plaintiffs insist that cold-end inspectors are "still required to find extremely tiny inclusions and to use several devices to measure the glass." (EEOC's Response at ¶ 22). They also have to lift and move glass, as well as cut strips. (Id.).

Before reorganization of production of the plant, jobs in glass production were largely divided by gender. (See Lance Saberhagen, Evaluation of Employee Selection Procedures for Melting Line Operator (Doc. 57-3) (hereinafter "Saberhagen Report"). 95.3% of the hot-end workers were male and 76.6% of the cold-end workers were female. (Id. at 21). Of men in the factory, 83.7% worked in the hot-end section. (Id.). Of women, 92% worked in the cold end. (Id.).

### a. The Plant reorganization

4

In October 2004, Schott decided to consolidate all of the Schott Opthalmic production in Grünenplan, Germany.  (Defendant's Statement at ¶ 42).  This decision was one based on the economics of the glass-making business and had been under consideration for several years.  (Id. at ¶ 43).  Officials at the Duryea plant attempted to limit costs and make production more efficient to prevent the loss of opthalmic production, but failed.  (Id. at ¶¶ 45-49).

Once the company decided to shut down a portion of production in the Duryea plant, officials had to reorganize production to meet the new priorities.  (Id. at ¶ 50).[2] Essentially, the company had to determine how to reorganize production to meet the needs of a facility that no longer produced opthalmic glass.  (Id. at ¶ 51).  The defendant contends that its goal was to "(i) retain those existing employees who were the most qualified to run optical glass production; and (ii) create a 'flexible' workforce, wherein employees could perform numerous production jobs as opposed to a single job in the production process."  (Id. at ¶ 53).  The EEOC denies that the defendant proceeded in this fashion.  (EEOC's Response at ¶ 53).  At first, defendant proposed simply to terminate the opthalmic unit and keep the optical one. (Defendant's Statement at ¶ 55).  That would have led to layoffs for the entire opthalmic unit workforce.  (Id. at ¶ 56).  Another option considered by the company was to eliminate some positions and then put up for bid the "crucible operator"

---

[2]The EEOC contends that the defendant was aware of the need to shut down much earlier, and had longer to prepare to consolidate the lines than it admits.  (See EEOC's Response at ¶¶ 45-50).

position, a "hot end" job.  (Id. at ¶ 58).  The parties disagree over whether the

company abandoned this plan on its own or at the union's insistence.  (Id.; EEOC's

Response at ¶ 58).

     As a solution to how to staff the reorganized factory, the company decided to

create a new position: "melting line operator" (MLO).  (Defendant's Statement at ¶

65).  The defendant asserts it had authority under the collective bargaining

agreement to create this new position.  (Id. at ¶ 66).  The MLO combined the jobs

performed on the "hot" and "cold" ends of the line.  (Id. at ¶ 67).  Putting one

employee in charge of work at both ends of the line is a return to production methods

in place at the plant before 1985.  (Id. at ¶ 69).

     In order to award jobs for the new MLO position, the company had develop

some sort of rating system to determine who was most qualified to occupy the new

positions.  Creating these new jobs meant a reduction in the size of the workforce.

To determine who should receive the MLO jobs, the company developed a rating

system for workers that purported to assign the jobs based on the skills the applicant

possessed.  (Id. at ¶¶ 70-71).  This rating system became known as "the skills

matrix" ("matrix").  (Id. at ¶ 72).  The process of creating this matrix and rating

workers on it is the central element of the instant lawsuit.

     Schott had previously used a similar system of rating job performance, though

not to this particular scale or for this particular job.  (Id.).  Earl Hall, human resources

director, and Hardy Pankrantz, production manager for hot ends operations, oversaw

creation of the matrix.  (Id. at ¶¶ 70-71).  Hall and Pankrantz requested that the shift

foremen provide a list of all job tasks and skills that would be required of melting line

operators after the reorganization.  (Id. at ¶ 74).  According to plaintiffs, one of those

who helped with this information, Mary Ellen Pajor, had worked primarily as a

bookkeeper for the previous ten years and did not have special knowledge of the

MLO processes.  (EEOC's Statement at ¶ 74).  George Vamos, Cold End Quality

Assurance Manager, also created a list of cold end job functions.  (Defendant's

Statement at ¶ 75).

    After the managers compiled this list of job functions, Pajor compiled a list of

the skills they named.  (Id. at ¶ 77).  Pankratz and Steven Krenitsky, Director of

Operations at the plant, reviewed the list.  (Id. at ¶ 78).  They determined that it was

"accurate and complete."  (Id.).  They thus established the final list of job skills.  (Id.).

Pankratz and Krenitsky then distributed the list to shift foremen, who were asked to

assign a weighting point value to each task.  (Id. at ¶ 79).  The foremen assigned a

numerical point value to each skill between 1 and 10, which defendant claims was

based on "the particular skill's level of difficulty and overall importance to the optical

glass production process."  (Id. at ¶ 82).  Once a foreman completed his weighting

task, Pajor calculated an average numerical value for each task by adding up the

number of points that the foremen had assigned the task and dividing it by three (the

number of foremen who had rated the tasks).  (Id. at ¶¶ 83-84).  This was the

"weighted average" for the task.  (Id. at ¶ 85).  Pankratz performed his own weighting

and compared it to the numbers the foremen had devised.  (Id. at ¶ 86).  He did not

change their numbers, deciding that they were fair.  (Id. at ¶ 87).

Once the numerical values were assigned each task, the company then

created a scoring system for grading each worker on those tasks.  (Id. at ¶ 88).  This

system was letter-based.  (Id.).  Under that system, the evaluator assigned the

worker a letter grade for the task, and the letter grade had a corresponding

numerical value.  (Id. at ¶ 89).  There were four letter grades.  (Id.).  "N" meant that

the worker needs training and could not perform the task at all; a worker received 0

points for that grade.  (Id. at ¶ 90a).  "M" meant that the worker could perform the

task with minimal assistance.  (Id. at ¶ 90b).  A worker with this grade received the

weighted average as a score for that task.  (Id.).  "P" meant a worker could "fully

perform" the task.  (Id. at ¶ 90c).  A worker with that grade was entitled to a score of

the weighted average + 1.  (Id.).  If the weighted average was 6, a worker with a P

would receive a 7 for the task.  (Id.).  "T" meant the worker was skilled enough in the

task that she could train others. (Id. at ¶ 90d).   With this grade, the worker was

entitled to the weighted average plus 2 as their score.  (Id.).

After managers established this system, Pajor created an Excel spreadsheet

on her computer that used a formula to assign workers points based on their ratings

for each task and the weight assigned that task.  (Id. at ¶ 91).  Once the worker was

rated on each task, the scores were added together to create a raw numerical score

(the "matrix score").  (Id. at ¶ 94).  The company then ranked the workers based on

their cumulative matrix scores.  (Id. at ¶ 95).  The plaintiffs contend that several male

employees had their matrix scores changed to add more points.  (EEOC's Response

at ¶ 95).  Those with the highest scores received the highest rankings.  (Defendant's

Statement at ¶ 95).  Employees who wanted one of the newly created MLO positions

had to bid on a job, and had to provide a matrix rating to be considered.  (Id. at ¶¶

96-97).  Around 57 persons submitted such bids, including 9 of the 11 individual

plaintiffs in the case.  (Id. at ¶ 105).

The dispute in this case is largely about the propriety of this system, both in

terms of the way it was designed and in the way it was executed.  The defendant

argues that tasks that were "more difficult, skilled and 'critical' to the glass-making

process" received greater weight in the matrix.  (Defendant's Statement at ¶ 80).

Plaintiffs agree only that some tasks received greater weight than others, and argue

that the matrix weighed more than "skill," including categories that were more

obviously subjective, like "supports company activities" and "applies feedback to

improve product performance."  (EEOC's Response at ¶ 80).  Plaintiffs also contend

that the foreman did not receive any guidance on how to establish these point values

other than the phrase "assign point value to above tasks 1 to 10, 10 being the most

difficult."  (Id.).  Defendant contends that the hot end tasks were more difficult, and

therefore received a greater weight than the cold end ones.  (Defendant's Statement

at ¶ 81).  Plaintiffs insist that cold end tasks were critical, since the final product went

out after the cold end tasks.  (EEOC's Response at ¶ 81).  Plaintiffs thus imply that

defendant undervalued those tasks.  (Id.).

In addition, plaintiffs contend that the rating system measured tasks which were not typically performed by workers on the hot or cold end, but more often performed by group leaders.  (Id. at ¶ 82).  Current MLOs related that they were rated on tasks that they have never had to perform as an MLO.  (Id.).  Plaintiff also argues that the foremen who did the weighting all had experience mostly on the hot end of the line.  (Id.).  John Nicks, for instance, was a foreman in the hot end from 1987 to 1993, left then company for three years, and returned again in 1996 to supervise the hot end.  (Id.).  He had only begun to supervise cold end employees in 2003.  (Id.).  Donald Krafchak, another rater, had worked at Schott since 1974, and had been a hot end supervisor since 1989.  (Id.).  He began supervising the cold end in 2002 or 2003.  (Id.).  Neither Vamos, the cold end quality manager, nor any of the four cold end forepersons were invited to participate in the rating process.  (Id.).  Plaintiffs also point out that union leaders recognized that the matrix appeared designed to favor hot end (male) workers and complained about it.

The parties also dispute the fairness of the evaluation of workers under this system.  The parties agree that the foremen were responsible for providing the ratings.  (Defendant's Statement at ¶ 109a).  The foremen then met with the worker to review the matrix rating, and an employee could dispute the score and request a change.  (Id. at ¶ 109f).  Plaintiffs contend that not all employees were fully informed by their foremen of their scores and the ability to challenge them.  (EEOC's

10

Response at ¶ 109f).  Defendant points out that foreman changed the scores of

workers who demonstrated that they could perform a task, and that the plaintiffs in

this case all agreed that they underwent this process and affirmed the accuracy of

the ratings.  (Defendant's Statement at ¶¶ 109g, 111).  Plaintiffs contend that the

process was hardly as objective or fair as the defendant contends.  Some ratings

were done by one supervisor and signed by another foreman, who never saw the

worker perform the task.  (EEOC's Response at ¶ 109a).  Other workers were given

credit for skill at a task simply on their testimony, rather than on actual observation.

(Id. at ¶ 109b).  Plaintiffs also complain that they were given their ratings but not

informed by their supervisors that they could dispute scores and change them.  (Id.

at ¶ 109g).  One female worker (Donovan) received "N" ratings for tasks she could

perform.  (Id.).  She did not dispute those ratings because she did not understand

what "N" meant.  (Id.).  Plaintiffs also have evidence that male workers were allowed

to claim skills they hadn't performed in years, but women were not able to do so.  (Id.

at ¶ 109h).  Some foremen accepted verbal assurances that workers could perform

a task and other foremen required that they demonstrate the ability.  (Id.).

### b.  The reorganized factory

After the company completed all of the ratings, the reorganization of the

factory occurred.  Workers received jobs based on their ratings.  (Defendant's

Statement at ¶ 119).  On October 13, 2004, the company posted the bid awards.

(Id. at ¶ 121).  The workers who received the 40 highest matrix ratings were awarded

MLO bids.  (Id. at ¶ 119).  36 of those 40 workers received immediate jobs, and the

bottom four were placed on a call-in list and were told they would receive calls to

come into work as needed.  (Id. at ¶ 120).  An employee who was not retained could

either accept a layoff and retain seniority rights for eighteen months or voluntarily

resign, waive senior and recall rights and receive a severance package.  (Id. at ¶

122).  The plaintiffs who did not receive positions accepted the severance benefits.

(Id. at ¶ 123).  Some of the plaintiffs claim that they were told not to dispute the

matrix ratings or seek recall, but instead to accept the severance.  (EEOC's

Response at ¶ 123).

Many more men than women obtained the MLO jobs.  (Defendant's Statement

at ¶¶ 125-30).  Defendant contends that the major factor in determining who

obtained MLO jobs was whether an employee worked on the cold end or the hot

end.  (Id. at ¶ 126).  Defendant argues that the male employees who worked

primarily on the cold end did not obtain jobs in the reorganization.  (Id. at ¶¶ 125-27).

Plaintiffs point to Richard Evans, whose job was primarily as a general helper

making boxes on the cold end, nevertheless obtained a position.  (EEOC's

Response at ¶ 124).  Of the 14 men who applied for MLO jobs from the cold end, 9

had experience on the hot end.  (Defendant's Statement at ¶ 126).  They all received

MLO positions.  (Id. at ¶ 127).  Of the 15 women who applied for MLO positions from

the cold end, two had previous experience on the hot end.  (Id. at ¶ 128-29).  Both

received jobs, being ranked 6 and 14 on the matrix.  (Id. at ¶¶ 129-30).  Defendant

contends that 2 women with minimal cold-end experience also received MLO positions, though they ranked low on the list.  (Id. at ¶ 131).  Plaintiffs deny that the women were inexperienced.  (EEOC's Response at ¶ 131).

As part of establishing the new production processes, defendant found that all of the workers needed to be trained to achieve qualification on those tasks where they were lacking.  (Defendant's Statement at ¶ 136).  None of the retained employees were competent in every task.  (Id.).  The company and the union agreed that eligibility for training would be determined by seniority.  (Id. at ¶ 137).  Plaintiffs allege that at times men with less seniority received training before more senior women who requested it.  (EEOC's Response at ¶¶ 137-38).  Employees who received training were re-rated on the matrix and achieved higher scores.  (Id. at ¶ 141).  The defendant insists that none of this training occurred between the time that the matrix process was announced and the bids posted on October 13, 2004.  (Id. at ¶ 143).  Plaintiff EEOC contends that at least two men received training on cold-end processes shortly before the matrix was announced.  (EEOC's Statement at ¶ 143). After December 27, 2004, defendant abandoned the matrix system for determining employment eligibility, and now focused on seniority in layoffs.  (Id. at ¶ 144-45).

**c.  allegations of past improper conduct in the workplace**

Both the EEOC and the intervenor plaintiffs point to conduct in the workplace which they contend created a discriminatory atmosphere.  The plaintiffs point out that male workers asked to fill in on the cold end were disdainful and reluctant to

participate, insisting that such tasks were "women's work."  (EEOC's Response at ¶

25).  When female cold-end workers returned glass to the hot end after finding flaws

in inspection, male cold workers sometimes became annoyed enough to curse and

throw glass or the paperwork defining the rejects.  (Id.).  One male inspector threw

hot glass on a table in front of Patricia Pavalonis, and the glass blew up in her face.

(Id.).  Workers also sometimes threw tools at women bringing back rejected glass to

the hot end.  (Id.).

The company had a practice of providing training for workers who transferred

from the cold end to the hot end.  As one male employee testified, "All through the

many years I spent at Schott, if you took a job, no matter what it was, you were

trained in it.  They wouldn't just throw you to the wolves.  You were shown how to do

it.  And any questions, you could ask.  I was never refused help."  (Id. at ¶ 38).

Women working on the hot end had a different experience.  Plaintiff Carolyn Blockus

testified that when she worked on the hot end for a brief time in 1996 male

employees Sid Pesotine and Fritz Shoback refused to provide her with training as

required.  (Id. at ¶ 39).  She reported this misbehavior to foreman Tom Luder.  (Id.).

He went to foreman Donald Krafchak to express Blockus's complaint.  (Id.).

Krafchak responded that "I really don't give a shit.  I don't want women on my shift."

(Id.). Krafchak allegedly made a similar comment at the time the MLO positions were

considered.  Production supervisor Lenny Cushner also allegedly claimed at a

similar time that "the plant would go to hell if women had to do these jobs."  (Id.).

14

Laura Figueroa bid on a hot end job in the 1980s and lasted only one evening.  (Id. at ¶ 38).  She heard the foreman say, "show her how to hit the tanks once and let her on her own the rest of the night."  (Id.).

Female workers also complained of harassing behavior.  Lori Zielinski worked in the hot end in the late 1990s.  (Id. at ¶ 39).  She reported several instances of sexual harassment from male co-workers.  (Id.).  Workers wrote obscene words ("c–nt") on her locker, as well as sexually suggestive phrases.  (Id.).  Zeilinski also had her mask destroyed, underwear stolen from her locker, and pornography strewn about her work space.  (Id.).  Workers verbally harassed her and stole her time card. (Id.).  She complained to a supervisor that she was not receiving the breaks she was due.  (Id.).  Her foreman heard this complaint, but did nothing.  (Id.).  These incidents occurred in 1999.  (Id.).  Patricia Pavalonis complained to a foreman Zielinski in 2003 or 2004 that foreman Berkoski had grabbed her breast, but she did not pursue charges because she had to work with Berkoski.  (Id.).  One employee reported to foreman Luder that a worker had exposed his private parts to her while walking along a catwalk.  (Id.).

The intervenor plaintiffs also offer a catalog of sexually offensive behavior from male coworkers that supervisors seemed to tolerate.  (See Intervenor Plaintiff's Counterstatement of Material Facts (Doc. 59) (hereinafter "Intervenor Plaintiff's Statement") at ¶ 37).  Male workers verbally abused, harassed and threatened female coworkers who rejected glass on cold-end inspection.  (Id. at ¶ 37a).

15

Sexually inappropriate behavior allegedly abounded, including a male worker who regularly exposed himself to female workers and a manager who touched female workers inappropriately.  (Id.).  Graffiti on the walls targeted women, offering statements such as "Cindy is a slut" or "if anyone wants a blowjob, see Lori or Cindi." (Id. at ¶ 37b).  Male workers decorated their work areas with nude pictures of women from pornographic magazines.  (Id. at ¶ 37d).  Managers did not act to remove this material.  (Id.).  Both workers and supervisors read pornographic magazines at work, and supervisors maintained a "library" of such materials in their offices.  (Id. at ¶ 37e).  Supervisors were also often dismissive of women in the workplace, derisively referring to certain tasks as "women's work" and voicing opposition to supervising women on their shifts.  (Id. at ¶¶ 37i-j).

### d.  EEOC actions

After the six intervenor plaintiffs lost their jobs in late 2004 they filed a complaint with the EEOC alleging sex discrimination.  The EEOC investigated the situation and on September 16, 2005 issued a letter that concluded that discrimination had occurred.  The report summarized the facts and concluded that "the Commission finds that Respondent subjected Charging Party and a class of females to sex discrimination in layoff as well as persistent, pervasive and patterned sex-based differential treatment and sexual harassment (hostile work environment). There is no indication that cold-end positions are any less skillful and Respondent's rationale is regarded as a subterfuge to hide its true sexist and discriminatory

16

motives.  The implementation of the matrix system was used to target and eliminate a class of jobs held by predominately female employees.  Females were blocked from receiving training and therefore were not being given the opportunity to compete for advancement."

The EEOC also had an expert investigator, Lance Saberhagen, prepare a report on the "evaluation of employee selection procedures for melting line operator." (See Saberhagen Report).  Saberhagen, who holds a PhD in industrial and organizational psychology, examined the matrix developed by Schott to determine whether it caused discrimination against female workers.  After exploring the matrix system, Saberhagen concluded that the selection process had an adverse impact on women.  The rating factors in the matrix favored men, since many more of the rating factors harmed women than men.  The company did not analyze the matrix scores to see if a sex bias existed, the people who created the matrix did not have training in establishing such a system, and the company made no effort to establish an equally effective and less discriminatory alternative.  Saberhagen also proposed three alternatives to the matrix system which he said would produce equally skilled workers and not have as discriminatory an impact on women workers.  The purpose of this report was to provide evidence of the disparate impact of the Schott program and to demonstrate viable alternatives, as required by the caselaw on disparate impact.

**e.  the lawsuit**

17

Plaintiff EEOC brought a sex discrimination lawsuit on June 22, 2006 (Doc. 1). The intervenor plaintiffs filed their motion for inclusion in the case on July 27, 2006 (Doc. 3).  After the court approved this motion (Doc. 10), the intervenor plaintiffs filed a complaint (Doc. 11) that repeated the EEOC's allegations of discrimination by disparate treatment and disparate impact.  The intervenor plaintiffs also made identical claims under the Pennsylvania Human Relations Act.

With the court's leave, plaintiff EEOC filed an amended complaint on January 12, 2007 (Doc. 27).  The amended complaint alleges that defendant violated Title VII of the 1964 Civil Rights Act "by subjecting Charging Parties and a class of female employees to a discriminatory layoff process which resulted in the loss of their jobs due to their gender."  This might be called the "disparate treatment" portion of the complaint.  Among the unlawful employment practices alleged by the plaintiffs were: a segregation of the work force by gender and an unwillingness to train women in the positions primarily occupied by men; an undervaluing of the skill required to do the jobs primarily occupied by women in the creation of the matrix that assigned the new MLO position, resulting in less change for female workers to obtain those jobs; an unfair rating process that gave men credit for the ability to perform jobs which they had never done; attempts by the Human Resources department to manipulate scores to give men higher ratings; of the 36 MLO positions provided, 34 went to men and 2 to women.  The complaint also raises a charge of "disparate impact" under Title VII, alleging that defendant subjected "Charging parties and a class of female

18

employees to a discriminatory layoff process" that "caused a disparate impact based on gender."  That portion of the complaint alleges that plaintiff matrix system for evaluating employees "had an adverse impact on female applicants who were selected for layoff at a significantly higher rate than male employees.  As relief, plaintiffs seek a permanent injunction prohibiting defendant and its agents and employees from engaging in any sexually discriminatory action; an order from the court directing defendant to institute a program to eliminate discrimination and rectify the effects of past discrimination; back pay and other financial remedies for those harmed by the unlawful employment practices; other compensatory damages for plaintiffs; and punitive damages.

After the close of discovery, the defendant filed a motion for summary judgment.  The parties then briefed the issue and the court entertained argument, bringing the case to its present posture.

## II.  Jurisdiction

As this case is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.  § 2000e, the court has jurisdiction pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## III.  Legal Standard

Granting summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (citing FED. R. CIV. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion.  International Raw Materials, Ltd. v. Stauffer Chemical Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party.  Anderson, 477 U.S. at 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  Celotex v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  Id. at 324.

20

**IV.  Discussion**

Defendant offers several reasons why the court should grant it summary judgment on plaintiff's claims.

**A.  Title VII Employment Discrimination Claim**

Courts have established a burden-shifting scheme for claims of sex discrimination under Title VII when no direct evidence of such discrimination exists: "the plaintiff must establish a prima facie case of discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection." Jones v. School Dist. of Philadelphia, 198 F.3d 403, 408 (3d Cir. 1999) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792,802 (1973)).  If the defendant meets that burden, the burden shifts back to the plaintiff, who must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for the discrimination."  Id.

**i.  Prima Facie Case**

Defendant argues that it should receive summary judgment on plaintiffs' claims because they have not made out a prima facie case of sex discrimination. Defendant contends that because all employees lost the positions they held because of the reorganization plaintiff cannot simply rely on the fact that women lost their jobs while men retained them.  Instead, they must show that workers similarly situated with plaintiffs who were outside the protected class (that is, women) were hired while

21

plaintiffs were not.  Because plaintiffs were not as qualified as those who obtained the jobs, they cannot make out the prima facie case.  The proper "similarly situated" comparison, defendant argues, would be with the men who worked on the cold end. Since those men did not obtain jobs either, no prima facie case has been established.

A plaintiff seeking to establish a prima facie case under Title VII "must show (1) that she is a member of a protected class, (2) she was qualified for the position, (3) she was discharged [or not promoted], and (4) the position was ultimately filled by a person not of the protected class."  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1066 (3d Cir. 1996).

The court finds that plaintiffs can make out a prima facie case here.  The evidence shows that the Schott factory had a history of gender segregation in the workplace, and that this segregation meant that skills were divided largely along gender lines.  Plaintiffs' argument is that they were not chosen for their positions because the defendant constructed the matrix system in a way that devalued the skills that women had in the workplace and overvalued those that men had developed.  In addition, all workers needed training for the newly designed workplace, and therefore the matrix did not really measure the skills necessary for the new jobs.  A reasonable juror could find that the matrix was not an accurate measure of the skill required for the job, and that women were excluded from jobs for which they were equally qualified.  Since far more men received the new positions

than women, the court concludes that plaintiffs have made out their prima facie case.

### ii.  Legitimate Non-Discriminatory Reasons

If the plaintiff meets its prima facie burden, the defendant must then show that it denied plaintiff's promotion for a "'legitimate, non-discriminatory reason.'" <u>Jones</u>, 198 F.3d at 408.  In order to meet its burden in a sex discrimination case, an employer need only introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."  <u>Fuentes v. Pierske</u>, 32 F.3d 759, 763 (3d Cir. 1994).  "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff."  <u>Id.</u> (emphasis in original).

Here, the defendant for business reasons decided that a shift in production arrangements in the corporation was necessary.  In deciding to eliminate an entire class of production, defendant needed to eliminate jobs.  As part of eliminating jobs, defendant decided to combine operations on the hot and cold end of the production line.  Defendant needed a means of deciding which workers to retain, and the matrix was this means.  Defendant contends that this constitutes a legitimate non-discriminatory reason for the business decision.

Plaintiffs do not appear to dispute that the defendant has met its burden in this area, though they do appear to say that the system was much less objective than the defendant's contend.  The court agrees that the need to reorganize the factory

23

represents a legitimate business reason for the defendant's actions.

### iii. Pretext

Once defendant meets its burden of providing legitimate non-discriminatory reasons for the employment decision, the burden shifts back to the plaintiff to show that a jury "could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action." Id. at 764.   Plaintiff must therefore "[produce] sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996).  A plaintiff must do more, however, than simply demonstrate that the employer did not make the correct hiring decision: "to discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is 'wise, shrewd, prudent, or competent.'" Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 328 (3d Cir. 1995).

Plaintiffs, defendant contends, insist that defendant should have used seniority as the selection method, and that plaintiffs cannot establish pretext merely by quarreling with the methods defendant used to assign the jobs.  Plaintiffs make this same argument about the failure to provide them with further training, defendant

24

insist, and it fails for similar reasons.

The court finds that plaintiffs have advanced evidence by which a reasonable jury could conclude that defendant's stated reasons for the hiring decision were mere pretext for its real motive of preventing women from obtaining jobs in the reorganized workplace.  Plaintiffs have produced a large degree of evidence–including expert testimony in the form of Dr. Saberhagen's report–that shows that the matrix system did not really measure the skills required for the job, but instead valued the skills that men were more likely to have than women.  They also have presented evidence that the matrix system was not applied fairly, and that gender bias occurred in the way that  managers evaluated workers. Combined with evidence that sexual animosity and harassment abounded in the workplace, and that managers frequently expressed a belief that women should not be employed at Schott, a reasonable jury could find that defendant's matrix system was merely an attempt to provide a statistical and "objective" veneer for plaintiff's underlying discriminatory goal.  The court will therefore deny defendant's motion on this point.

**B.  Disparate Impact**

Plaintiffs contend that even if they cannot make out a prima facie case for disparate treatment employment discrimination, they can make out a claim for disparate impact discrimination.  Defendant argues that plaintiff's disparate impact claim cannot survive summary judgment.

**i. Prima Facie Case**

A plaintiff seeking recovery on a disparate impact theory invokes a claim that "'involve[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (quoting Teamsters v. United States, 431 U.S. 324, 335-36 (1977)).  In the disparate impact context, "'a facially neutral employment practice may be deemed [illegally discriminatory] without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case." Id. at 52-53 (quoting Wards Cove Packing Co. v. Antonio, 490 U.S. 642, 645-46 (1989)).

A plaintiff seeking to prevail on a disparate impact claim must first establish a prima facie case.  To do so, "the plaintiff must demonstrate that application of a facially neutral standard has caused a 'significantly discriminatory hiring pattern.'" Newark Branch, NAACP v. City of Bayonne, 134 F.3d 113, 121 (3d Cir. 1998) (quoting Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 798 (3d Cir. 1991)).  Such evidence "usually focuses on statistical disparities."  Id. Defendant does not dispute that plaintiffs can establish a prima facie case.  Nor could it, since the jobs in the reorganized factory clearly went in disproportionate numbers to men.

### ii.  Selection criteria job-related and consistent with business necessity

If a plaintiff makes out a prima facie case, the defendant then has the burden

26

to demonstrate "a business justification for continued use of the challenged practice." Newark Branch, 940 F.2d at 798.  The employer must show that "the employment practice is 'job related for the position in question and consistent with business necessity.'" Lanning v. Southeast Pennsylvania Transportation Authority, 181 F.3d 478, 485 (3d Cir. 1999) (quoting 42 U.S.C. § 2000e-2k).

Defendant argues that the matrix plan was certainly job related and consistent with business necessity, since the company needed to reduce staff and set up new production techniques.  The company sought to identify and retain competent employees, and set up the matrix system to do so.  Plaintiffs respond that the matrix system benefitted men, and it did not really measure the skills required to perform the MLO job.  The matrix was also designed not by an expert in vocational training, but by company employees with no formal education in the area.  The matrix made use of job standards that were not required of MLOs, but of group leaders and asked workers to perform tasks that they would never have to as MLOs.  Accordingly, the matrix did not consistently measure the needs of the employer in the job, but instead served as a means of weeding out the women who had not traditionally occupied positions where they could be trained in the work valued by the matrix.  In addition, defendant has not presented any empirical proof in the form of a "validation study" that would show that the selection process was both job-related and consistent with business necessity.  Despite a warning from the union shop steward, the company did not perform this study.

27

The court finds that a reasonable jury could conclude that the matrix plan did not represent a system which was job related and consistent with business necessity.  Plaintiffs have offered expert evaluations and anecdotal evidence that indicates that matrix system did not adequately measure either the skills workers had obtained or the skills required for the new positions.  They have also demonstrated that the matrix built in a bias towards the skills men had obtained in a workplace that was largely sex-segregated, even though those skills were not always necessary for the new positions.   While a jury could find that defendant designed the best system it could to pass out jobs fairly under difficult systems, a jury could also find that the matrix was designed to perpetuate the long-term biases in the factory and did not adequately measure who could actually perform the new jobs.  Accordingly, summary judgment is inappropriate on these grounds.

### iii.  Equally effective alternative

Though the plaintiffs could prevail if a jury concludes that the matrix system was not consistent with business necessity, the court will address whether evidence exists to support plaintiffs' claims that equally effective alternatives exist.  If defendant meets its burden of demonstrating business necessity, "the plaintiffs may still prevail if they can show that an alternative employment practice has a less disparate impact and would also serve the employer's legitimate business interest." Lanning, 181 F.3d at 485.  Defendant argues that Schott could not have established a system that would have met it goals that would have been less discriminatory.

Seniority, for example, would not have allowed an appreciably larger number of women to take the position.  Neither would have expanding the crucible operator position instead of creating the MLO. Doing so would not have created any more opportunities for women under the existing union contract.  Plaintiffs argue that they have provided equally effective alternatives.  They point to Dr. Saberhagen's report, which suggests three examples of equally effective alternatives that change the weighting of the matrix factors and allow the hiring of (marginally more) women.

The court also finds that the plaintiffs can survive summary judgment on these grounds.  While a jury may not be convinced that plaintiff's alternatives are feasible or significant, that same reasonable jury could also find that plaintiffs have offered an alternative that overcomes the biases inherent to the matrix plan and the history of the Schott workplace.  The court will therefore deny summary judgment on plaintiffs' disparate impact claim as well.

### C.  Individual Plaintiffs

Defendant also challenges the claims of the individual plaintiffs in the case. The court will address each challenged plaintiff seperately.

### i.  Deborah Gdovin

Defendant contends that Gdovin has been receiving disability benefits from Social Security and is thus not able to work and unqualified for the position.  She began receiving benefits November 1, 2004.  Plaintiffs respond that Gdovin is eligible to recover for any time period in which she could work, and therefore should

not have summary judgment granted against her.  They also point out that this

argument is more about the amount of damages than whether plaintiff can recover at

all.

The court agrees with the plaintiffs.  While Plaintiff Gdovin may not be eligible

for a great deal of compensation, a jury could nevertheless find that she had been

the victim of discrimination as a result of defendant's plant reorganization.  Gdovin

could prove that she suffered some damages, and a jury could reasonably determine

the amount she is owed.  The court will deny summary judgment against this

plaintiff.

### ii.  Laura Figeuroa

Defendant argues that Plaintiff Laura Figeuroa has been totally disabled and

unable to work since October 2006.  She therefore is not qualified for the position

and cannot prevail.  Plaintiffs respond in the same way that they do for Gdovin.

For the same reasons as with Plaintiff Gdovin, the court denies summary

judgment on these grounds.

### iii.  Lori Zielinski

Defendant argues that Zielinski's interests are adverse to those of the other

plaintiffs and she therefore cannot recover.  She received an MLO position based on

her skills, and therefore any other alternative proposed by plaintiffs would harm her,

and she therefore cannot be part of the litigation.  Plaintiff points out that Zielinski

was subject to gender-based harassment and discrimination both before and after

receiving the MLO position.  After she received the MLO job, she was asked to train other employees she feared would eventually take her job.  She was criticized for seeking more training in order to prevent this job loss and felt discriminated against. Zeilinski was placed on layoff status with no recall date and took severance pay rather than risk having nothing.  She has therefore, plaintiff asserts, presented facts to survive summary judgment.

The court finds that plaintiff Zielinski's interests are not adverse to those of the other plaintiffs, despite the fact that she received one of the MLO positions.  She has presented evidence which indicates she was evaluated on the matrix system, one of the sources of discrimination in the case.  She also has presented evidence that indicates that her rating on that system at least in part led to her decision to accept a severance package, which changed the nature of her compensation and limited any future benefits.  Accordingly, a jury could conclude that she suffered damages from defendant's discriminatory practices.  The court will deny summary judgment against this defendant as well.

### iv. Named plaintiffs cannot establish constitutional standing

In its reply brief, defendant argues that none of the named individual plaintiffs can establish constitutional standing to bring their claims, a requirement even under the disparate impact theory.  Defendant contends that these plaintiffs would not have been qualified to receive the position under the alternative standards proposed by Dr. Saberhagen, and they therefore cannot prevail on this claim.

The court disagrees.  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 37 (1976).  Standing provides "justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III."  Warth v. Seldin, 422 U.S. 490, 498 (1975). The Supreme Court has held that "the standing question in its Art. III aspect  is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'"  Id. at 38 (quoting Warth, 422 U.S. at 498-99 (1975)).  The Court has described three elements that comprise the "irreducable constitutional minimum of standing."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  A plaintiff must first "have suffered an 'injury in fact'–an invasion of a legally protected interest which is (a) concrete and particularized [citations omitted] and (b) 'actual or imminent, not 'conjectural or hypothetical.'"  Id. (quoting Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).  Next, the injury suffered by the plaintiff must by causally connected to the conduct of which the plaintiff complains:  "the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court.'"  Id. (quoting Simon, 426 U.S. at 41-42).  Finally, "it must be 'likely' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable

decision.'" Id. (quoting Id. at 38, 43).

Here, defendant argues that a number of the individual plaintiffs would not have been qualified for their positions under any of the alternatives proposed by the plaintiffs.  As such, they can show neither that they were injured by the allegedly discriminatory practices nor that their injury would be redressed by the solutions the plaintiffs seek.  The court finds standing exists on the disparate impact claim even for those plaintiffs who would not be qualified for positions on the EEOC's proposed alternatives.   First, the injury claimed by all of the plaintiffs is gender-based employment discrimination.  The court has concluded that these plaintiffs could prevail under a disparate treatment claim.  The disparate impact theory is another way of proving that the matrix enshrined discrimination.  These plaintiffs could prove that the matrix system cost them their jobs.  If a jury believed that the matrix system was not a legitimate business measure, they would certainly be able to show an injury and plaintiffs would not need to demonstrate a less discriminatory alternative to prevail.  Since the court has found that plaintiffs could prevail on that theory, summary judgment is inappropriate on the disparate impact claim.  A jury could, of course, conclude that some of the plaintiffs were not entitled to damages if that jury found that plaintiffs could only prevail on an "equally effective alternative" theory. Since the court has found that the plaintiffs could prevail on either of two grounds on their disparate impact claim, however, summary judgment is inappropriate on the claim at this time.

## V.  Conclusion

For the reasons stated above, the defendant's motion for summary judgment will be denied.  An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **No. 06cv1246** |
| **OPPORTUNITY COMMISSION,** | : | |
| **ARLENE ANDERSON,** | : | **(Judge Munley)** |
| **CAROLYN BLOCKUS,** | : | |
| **LAURA FIGUEROA,** | : | |
| **DEBORAH GDOVIN,** | : | |
| **PATRICIA PAVALONIS, and** | : | |
| **YVONNE PRYWARA,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHOTT NORTH AMERICA, INC.** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### ORDER

**AND NOW**, to wit, this 29th day of September 2008, the defendant's motion

for summary judgment (Doc. 42) is hereby **DENIED**.


**BY THE COURT**

_____
**s/ James M. Munley**
**Judge James M. Munley**
**UNITED STATES DISTRICT COURT**