## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **No. 06cv1246** |
| **OPPORTUNITY COMMISSION,** | : | |
| **ARLENE ANDERSON,** | : | **(Judge Munley)** |
| **CAROLYN BLOCKUS,** | : | |
| **LAURA FIGUEROA,** | : | |
| **DEBORAH GDOVIN,** | : | |
| **PATRICIA PAVALONIS, and** | : | |
| **YVONNE PRYWARA,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHOTT NORTH AMERICA, INC.** | : | |
| **Defendant** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

### MEMORANDUM

Before the court are the parties' motions in limine in the instant employment discrimination case.  Having been fully briefed, the matters are ripe for disposition.

**Background**

This case concerns the 2004 reorganization of glassmaking operations at a plant in Duryea, Pennsylvania operated by Defendant Schott North America ("Schott").[1]  Prior to the reorganization, glassmaking production had been divided into two sets of jobs.  Jobs on the "cold end" of the production line were largely

---

[1]For a full explanation of the facts of the case, please see this court's memorandum and order denying defendant's motion for summary judgment, issued September 29, 2008. (Doc. 73)

staffed by women, while those on the "hot end" of the line were largely performed by men.  The reorganization resulted in the elimination of one type of glass production from the factory and a downsizing of the workforce.   The division of production between the "hot end" and "cold end" was eliminated.  In order to staff the reorganized production line, defendant created the new position of "Melting Line Operator" ("MLO").  Plaintiffs contend that the system that defendant developed and used to assign the new MLO–referred to here as "the matrix"–resulted in unlawful discrimination on the basis of sex.  They contend that the matrix as designed and implemented by defendant both enshrined a long history of discrimination against women in training and job assignment and improperly valued the skills most likely possessed by men.  Plaintiffs raise both a disparate impact and a direct sex discrimination claim.

**Discussion**

The parties raise a variety of motions in limine.  The court will address each in turn.

**I.  Plaintiffs' Motions**

**a.  Plaintiff EEOC's Motion to Exclude any and all Reference to Lori Zielinski's Alleged Sexual Encounter with Robert Zielinski at Defendant's Worksite**

Plaintiff Equal Employment Opportunity Commission seeks to an order from the court excluding from admission at trial any evidence related to Lori Zelinski's alleged sexual encounter with her husband Robert at the Defendant Company (Doc.

78).  Zelinski is one of the plaintiffs represented by the EEOC in the case.  Defense counsel asked Lori Zelinski during her deposition if she had ever been caught having sexual relations at work with her husband, who also employed by defendant. Zelinski offered a categorical denial and claimed that any individual who made such an allegation would be lying.  The EEOC contends that questions about this alleged encounter would be irrelevant, unduly embarrassing and unduly prejudicial, especially because no such encounter ever occurred.

The defendant has notified the court that it does not oppose this motion (Doc. 109), and the court will therefore grant it.

## II.  Defendants' Motions

### a.  Social Security Disability Income Benefits for Claimants Deborah Gdovin and Laura Figueroa

Defendant seeks an order from the court directing that claimants Deborah Gdovin and Laura Figueroa cannot recover back pay or front pay during the period when they were covered by Social Security Disability Income (SSDI) benefits (Doc. 81).  Plaintiffs have notified the court that they do not oppose this motion (Doc. 103), and the court will therefore grant it.  At the same time, the court notes that Gdovin and Figueroa are not precluded from recovering other damages, such as compensatory or punitive damages, as deemed appropriate by the jury.

### b.  Plaintiffs Gdovin, Moran and Guzik

Defendant argues that plaintiffs Deborah Gdovin, Margaret Moran and Sally Guzik are, for various reasons, precluded from arguing or presenting evidence that

3

they were rejected from the jobs in question (Doc. 83).  Plaintiff Gdovin has admitted

that she suffered from a physical disability that prevented her from working on the

date of her layoff, and has received Social Security Disability benefits as a result.

Neither Plaintiff Moran nor Guzik submitted bids for the jobs in question, and

therefore cannot argue that they were denied positions in that process.  Defendant

seeks an order precluding these defendants from arguing that they were rejected

from the jobs, as well as an order preventing the plaintiffs from presenting the jury

with any statistical evidence based on the premise that these claimants were

rejected for the jobs in question.  Finally, defendant requests that the court enter

judgment against these plaintiffs.

Plaintiffs respond that the defendant made the identical arguments in its

motion for summary judgment, and is merely attempting to reargue the meaning of

the evidence in its motion in limine.  The court agrees with the plaintiffs.  The

defendant had an opportunity to argue that these plaintiffs lacked evidence to

support their claims in its motion for summary judgment.  The court considered the

evidence and concluded that a reasonable juror could find for the plaintiffs based on

these facts.  The defendant should not use a motion in limine as a motion for

reconsideration.  Neither should a motion in limine serve as piecemeal litigation,

taking as many bites at the apple as necessary to achieve the litigant's desired end.[2]

---

[2]In a reply brief (submitted without leave of court) (Doc. 110) defendant argues that
it did not make every argument related in the motion in limine in its motion for summary
judgment.  The defendant does not explain why the evidence to support this argument was

In any event, the motion is premature, as the court has not had the chance to evaluate the testimony that plaintiffs will present at trial.  The defendant may make an appropriate motion at the close of the plaintiff's case if the evidence for these plaintiffs' claims appears insufficient to go to a jury.  The instant motion, however, will be denied.

### c.  Lay Opinion Testimony Regarding the Import of Cold-End Tasks

Defendant seeks an order from the court prohibiting the plaintiffs from eliciting "lay opinion" testimony regarding the relative import of cold end tasks to the manufacturing process (Doc. 85).   Defendant anticipates that plaintiffs will attempt to obtain such testimony from two witnesses, Michael Kepich, a union steward who disagreed with the rating process, and Bertha Yuhas, a long-time employee who testified in her deposition that cold-end tasks were more important than hot-end ones.  Defendant claims that this evidence about the importance of cold-end tasks is not relevant to the plaintiffs' claims and constitutes prohibited lay opinion testimony.

The court will deny defendant's motion with respect to Mr. Kepich.  At issue in this case is whether the defendant discriminated against women in constructing a skills matrix for assigning positions after the factory reorganization.  Kepich played a role in designing the matrix at issue here, and his experience and assumptions in creating that matrix are relevant to plaintiffs' discrimination claims.  Kephich can also

_____

not available at the time of the summary judgment motion and why the argument should not be considered waived.

testify on the process of calculating matrix scores and their use in assigning jobs.

Kepich therefore has knowledge of the "relative import of cold end tasks" in

designing and employing the matrix.  This case is largely about the process that

defendant used to reassign jobs in the factory's reorganization and the way that the

weighting of skills served to discriminate against female employees.  Kepich's

knowledge of that process would therefore have a "tendency to make the existence

of any fact that is of consequence to the determination of the action more or less

likely."  FED. R. OF EVID. 401.  Kepich's opinion on the import of cold end tasks is also

not unduly prejudicial.  Defendant contends that the jury would be misled by

testimony on the import of cold-end tasks, since they relate largely to a type of

production eliminated in the reorganization.  The court finds that a jury could easily

understand that Kephich's testimony relates to the way that the new jobs

incorporated assessments and assumptions about the old jobs, and would not be

unduly swayed by discussions of the skill involved in performing each task.

The court will also deny the motion with respect to Ms. Yuhas.  Yuhas, who

had more than thirty years of experience working on the cold end of the production

line, also worked to train successful applicants for positions in the reorganized

factory.  Yuhas therefore has knowledge of how cold end tasks were performed and

the skills required to perform them.  She also has knowledge of how the new

production methods incorporated those skills.  Yuhas's experience training workers

in the new methods is also relevant to the question of how the new jobs incorporated

worker's old skills and thus to a central question in the case.  To the extent that her testimony addresses the "relative importance" of cold-end tasks, that testimony has a "tendency to make the existence" of a job design that improperly weighted skills possessed by men in the matrix "more or less likely."  FED. R. EVID. 401.  The testimony is also not unduly prejudicial.  A jury can easily determine how much credit to give Yuhas's assessment of the skills required to perform the jobs and would not give undue credit to Yuhas's long experience with the company in evaluating the process of creating new positions.

The court likewise rejects defendant's argument that both witnesses' testimony on the relative importance of cold end tasks to the production process would be improper lay opinion testimony.  As the court understands the proposed testimony, both Kepich and Yuhas will testify as to the earlier organization of the factory, the relative skills required for that work, and the way that those earlier skills were incorporated in the matrix that determined which employees would be retained after the reorganization.  Both Kepich and Yuhas had extensive experience in the factor and first-hand knowledge of how at least some of the jobs that made up the matrix worked.  Federal Rule of Evidence 701 limits lay opinion testimony to that which is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  The court concludes that the witnesses' testimony could meet

this criteria.  Defendant can demonstrate the limits of the witnesses' knowledge on

cross-examination.  In any case, the court cannot anticipate the exact contents of the

testimony at this time.  In that sense, the motion is also premature.  The court will of

course entertain an appropriate objection to particular testimony offered at trial.

### d.  Stray Remarks Untimely Made by Non-Decision-Makers

Defendant seeks the exclusion of testimony regarding stray remarks made

remote from the employment decision at issue in the case and/or by individuals who

were not involved in the decision at issue.  (Doc. 87).  Defendant points to

statements from Donald Krafjack and Phil Kolatis, foremen on the "hot end" of the

line, that they did not want to supervise any women on their shifts.  Another

employee, Lenny Cushner, claimed that the plant would "go to hell" if women had

jobs traditionally held by men.  Defendant claims that this testimony is inadmissible

hearsay and irrelevant even if admissible under a hearsay exception.  The

statements were made by persons unrelated to the decision making process and

made at a time far distant from the employment decisions here in question.  The

remarks are thus merely stray comments not relevant to the facts here at issue.

Finally, defendant insists that the statements in question are unduly prejudicial and

should be excluded on those grounds.

The court will deny the motion.  First, the court concludes that the statements

in question are not hearsay.  Federal Rule of Evidence 801(c) defines hearsay as "a

statement, other than one made by the declarant while testifying at the trial or

8

hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c).  Courts have concluded that discriminatory remarks made about the suitability of particular employees which serve as circumstantial evidence of a discriminatory atmosphere in an employment discrimination suit are not hearsay, since "the statements were not offered to prove the truth of the matters asserted." Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d cir. 1997) (finding that a "statement that 'an eager, high energy person will get more done in one month than someone who has retired in place will do in one year' was not offered for its truth" but rather "to illustrate the CEO's state of mind on the issue of unproductive (and seemingly older) individuals."); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1249 (6th Cir. 1995) (finding that "disparaging and racist comments allegedly made by [defendants] were not offered to prove the truth of the statements but to demonstrate the racial attitudes of" defendants and were thus not hearsay.); Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1423 (7th Cir. 1986) (finding that "evidence such as that [defendant's employee] called blacks 'niggers' was not used to prove the truth of such utterances (whatever exactly that would mean) but to show what [the employee's] racial attitudes were" and thus not hearsay).  Here, Cushner's statement is not hearsay, since plaintiffs do not attempt to prove the truth of the matter that the workplace would "go to hell" if too many women had particular jobs. Likewise, the statements of foremen Krafjack and Kolatis that they would never supervise any women is not offered for the proof of that statement, but as

9

circumstantial evidence of a discriminatory atmosphere and attitudes.  As such, the statements are not hearsay and are admissible.

Even if the statements from Krafjack and Kolatis were offered for the truth of the matter asserted, however, the statements would be admissible as admissions of a party opponent.  Federal Rule of Evidence 801(d) declares that a statement is not hearsay if it "is offered against a party and is (A) the party's own statement . . . or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  FED. R. EVID. 801(d)(2)(A, D).  Krafjack and Kolatis, as employees, were clearly defendant's servants, and their statements were made during their employment.  Moreover, Krafjack and Kolatis, as supervisors, were clearly speaking within the scope of their employment when discussing who they would supervise and why.  As such, their statements, even if hearsay, would be admissible under the exception in Rule 801(d)(2)(D).  See, e.g., Marra v. Philadelphia Housing Authority, 497 F.3d 286, 298-99 (3d Cir. 2007) (finding that an employee's statement was not inadmissible hearsay because the employee "was authorized to speak to [the witness] about his perception of P[hiladelphia] H[ousing] A[uthority']s disciplinary practices, formal or otherwise, and thus his opinion that those employees who testified adversely to the PHA would face 'repercussions' concerned a matter within the scope of his employment."); Charrette v. S.M. Flickinger Co., Inc., 806 F. Supp. 1045, 1058 (N.D. N.Y. 1992) (finding that "statements attributed to [plaintiff's] supervisors as to his job

performance clearly concern matters within the scope of the agency of the supervisor.").

The court also rejects defendant's argument that the statements here in question are irrelevant and therefore inadmissible.  Defendant contends that the comments were stray remarks made by non-decision makers and temporally distant from the decision in question.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992).  Still, "although stray remarks by non-decisionmakers alone are insufficient to establish discriminatory intent, we have held that such remarks can still constitute evidence of the atmosphere in which the employment decision was carried out[.]"  Walden v. Georgia-Pacific Corp., 126 F.3d 506, 521 (3d Cir. 1997).  The Third Circuit Court of Appeals has found that "discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination."  Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995).  Thus, though "stray remarks by non-decisionmakers may be relevant to proving" discrimination, "the district court retains its normal discretion to exclude such evidence under general relevancy principles."  Walden, 126 F.3d at 521; see also, Ezold, 983 F.2d at 547 (finding that "[i]f we were to hold that several stray remarks by a nondecisionmaker over a period of five years, while

11

inappropriate, were sufficient to prove that Wolf's associate evaluation and partnership admission process were so infected with discriminatory bias that such bias more likely motivated Wolf's promotion decision than its articulated legitimate reason, we would spill across the limits of Title VII.").

The question for the court, then, is whether the comments here in question are relevant to the issues in the case.  The court finds that the comments are relevant to the employment discrimination claim and should not be excluded as stray remarks by decisionmakers temporally unrelated to the employment decision in question. First, the court notes that comments made by Krajack were remarks by a decisionmaker.  The question in this case is whether the matrix was designed in a way that institutionalized discrimination, and Krajack played a role in designing that matrix.  His attitude towards women, as expressed in his comments, is surely relevant to what motivated his decisions in constructing the matrix.  In addition, because the plaintiffs have presented evidence that a sexually discriminatory workplace existed over a period of years and that this environment created conditions that left women untrained for some of the jobs valued in the matrix, statements that demonstrate non-decisionmakers' attitudes towards women provide circumstantial support for plaintiffs' claims.  Those statements are thus likewise relevant to the case.  The court will deny the defendant's motion.

**e.  Exclusion of Evidence of Sex Discrimination Case of Judith Luder**

Defendant seeks to exclude testimony or other evidence that references a sex

discrimination case pending in this jurisdiction brought by Judith Luder (Doc. 89).

Judith Luder has filed suit in connection with discrimination she claims she suffered

when defendant removed her as a group leader after the reorganization of glass-

making in the factory.   Defendant contends that evidence from Luder's case is not

admissible in this case pursuant to Federal Rules of Evidence 402, 403 and 404.

Defendant's decision on Luder's employment was not related to the decision on

plaintiffs' employment, and defendant did not use the matrix rating system to

determine Luder's employment that was at issue here.  As such, introducing

testimony about Luder's situation would only confuse the issue.  Because the

evidence of discrimination in Luder's case is not related to the evidence of

discrimination in this case, defendant argues that the evidence would be unduly

prejudicial–jurors would be encouraged to make their decision based on a general

atmosphere of discrimination, not the facts of the case.  Finally, defendant argues

that the evidence of this suit should be excluded because it would serve only as

evidence of defendant's "bad character" and encourage the jury to find for the

plaintiff on those grounds.

Plaintiffs argue that the evidence should be admissible, since Luder's claims

bear much in common with their claims.  They point to several sets of shared facts in

their cases and hers:  Luder's termination was part of the same plant reorganization

that gave rise to this action; she worked in the same "cold end" portion of the factory

as the plaintiffs here, and, like them, lost her job after her employer's used an

allegedly discriminatory "matrix" to determine whether she had the skills to retain that job; like the plaintiffs here, Luder's termination was influenced by John Krafjack, who had a long history of hostility towards women in the workplace; and Luder and the plaintiffs both argue that a hostile work environment contributed to the discrimination in hiring they faced.  Plaintiff also argues that the motion in limine is impossibly vague, and the court cannot know which evidence to exclude.

The court will deny this motion in part and grant it in part.  The court agrees that evidence that Luder has filed a sex-discrimination lawsuit and evidence about that the status of that suit is not relevant to any fact of consequence to this litigation. Introducing evidence of the fact of Luder's suit would serve only to confuse the jury and could encourage it to find for the plaintiffs for improper reasons.  As such, the court will preclude plaintiffs from offering testimony that Luder has filed a sex-discrimination lawsuit against the defendant or any testimony related to the status of that lawsuit.

At the same time, however, the court finds that the facts underlying Luder's case are relevant to this action and admissible.  First, evidence of Luder's termination is relevant evidence.  The termination was not temporally distant from the employment decision at issue here.  Indeed, that decision arose from the same set of circumstances and involved the same types of measures of employment worthiness at issue in this case.  The facts of Luder's separation would makes facts of consequence to this litigation more or less likely, and the court will not exclude

14

such evidence.  See Fed. R. Evid. 401.

The court also rejects the argument that such evidence would be cumulative, prejudicial or confusing to the jury.  Instead, the jury could come to understand better how defendant came to employment decisions by examining Luder's experience. While the jury might come to the conclusion that an animus towards women shaped the construction of the employment matrix, the same jury might also use Luder's termination as evidence that the defendant assiduously tried to ensure that the workers with the skills most useful to the company remained in its employ, regardless of their gender.

The court also rejects the argument that such evidence of the facts leading to Luder's termination should be excluded under Rule 404(b) as "[e]vidence of other crimes, wrongs or acts" designed to "show action in conformity therewith."  Fed. R. Evid. 404(b).  The evidence is relevant to the facts of this case, since it demonstrates how the employer went about making the employment decisions at issue here.  Plaintiff does not seek to admit the evidence to prove that the defendant was a bad actor in another context and to encourage the jury to punish defendant for actions completely unrelated to the case.  Instead, plaintiff seeks admission of the evidence to prove that defendant's employment decisions in the factory reorganization represent a pattern of intentional discrimination.  The court will therefore deny the motion in part and grant it part.  The plaintiffs may introduce evidence of the facts underlying Luder's termination, but they may not introduce

15

evidence that she has filed a lawsuit related to that termination or discuss the status of that case.

### f. Testimony of Lance Seberhagen

Defendant seeks to preclude the testimony of Lance D. Seberhagen, an expert in the field of industrial psychology, employee selection and statistical analysis (Doc. 91). Dr. Seberhagen offers expert opinions on the use of the skills matrix to select employees, the adverse impact of that matrix and the selection process on female employees, the relationship between the matrix and the defendant's employment needs, and alternatives that defendant could have used to achieve its business objectives. Defendant contends that Seberhagen's expert report is filled with errors, has biased and unsupported allegations, and is replete with improper legal opinions. As such, the report and Dr. Seberhagen's testimony is inadmissible under federal law.

Federal Rule of Evidence 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training or education" may provide opinion testimony "if (1) the testimony is based upon sufficient facs or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. Courts have described the function of the district court in determining whether to admit expert testimony as a "gatekeeping" one. The trial judge has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the

task at hand."  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 598

(1993).  Thus, "[t]he objective of that requirement is to ensure the reliability and

relevancy of expert testimony.  It is to make certain that an expert, whether basing

testimony upon professional studies or personal experience, employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an

expert in a particular field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152

(1999).  The court will evaluate Dr. Seberhagen's testimony based on these

standards.

Defendant challenges the testimony on several grounds.  The court will

address them in turn.

### i.  Exclusion of the report in general

### a.  Seberhagen's qualifications

Defendant offers several reasons for the court to conclude that Dr.

Seberhagen's report and proposed expert testimony is improper.  The defendant

argues first that Seberhagen is not qualified to opine on the appropriateness of the

matrix because he does not have any knowledge of or training in glassmaking or

engineering, and thus cannot determine whether the skills valued by the defendant

in the matrix were the skills appropriate to the job.  As such, he lacks the requisite

expertise to testify on these matters.

Federal Rule of Evidence 702 provides, in pertinent part, that "[i]f scientific,

technical, or other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue" a fully qualified expert may testify.  See also

United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995) (recognizing "the 'strong

and undeniable preference for admitting any evidence having some potential for

assisting the trier of fact' which is embodied in the Federal Rules of Evidence"

[citations omitted] and noting that "Rule 702, which governs the admissibility of

expert testimony, specifically embraces this policy.").   Dr. Seberhagen's resume

confirms that he earned a PhD in 1979 from the University of Minnesota in

industrial/organizational psychology, writing his dissertation on "Sex discrimination in

salaries within state government." (Resume of Lance Seberhagen included in  Doc.

91-3 at 1).  Seberhagen has worked for more than forty years on various personnel

matters.  (Id.).  Included in that experience is the development of "selection

procedures for hourly production jobs" at major manufacturing concerns like

American Video Glass, Corning and Honda of America, as well as a number of other

large employers.  (Id.).  Seberhagen assisted a Texaco refinery in creating a

"performance appraisal procedure as basis for layoff of non-union employees."  (Id.).

He has served as a consultant in numerous other evaluations of worker

qualifications, for organizations as varied as the Defense Department and the

Maryland Correctional System, and in a number of legal matters and employment

disputes.  (Id. at 2).  Seberhagen has been a witness or technical adviser in more

than 100 court cases "regarding employee selection, position classification,

compensation, and other matters."  (Id. at 2, 10-19).  Seberhagen is a member of

the American Psychological Association, the American Statistical Association and the Society for Industrial and Organizational Psychology. (Id. at 4). He has published three books and numerous articles and presented papers at dozens of conferences on employee selection, rating and management. (Id. at 4-8).

A review of Dr. Seberhagen's report reveals that his criticisms of the matrix did not attempt to address technical aspects of the production process itself, but instead the way that the defendant constructed the matrix, areas clearly within his expertise. Dr. Seberhagen argues that the defendant "did not employ or retain anyone who was professionally trained and experienced in the development, validation, and use of employment tests to develop valid selection procedures for the MLO." (See Lance Seberhagen, EVALUATION OF EMPLOYEE SELECTION PROCEDURES FOR MELTING LINE OPERATOR (Doc. 91-3) (hereinafter "Rpt.") at 13). He characterizes defendant's creation of the matrix as "a quickie project" that used "in-house engineers, production supervisors, foremen, and assistants" rather than anyone with specific training in employee selection to construct the matrix. (Id.). Seberhagen also contends that the matrix was insufficient because "linkage" between the skills rated in the matrix and "observable job duties" was not formally made, assessments included in the matrix measured jobs that were not included in the new position, and scores were given to one person for jobs normally performed by two people. (Id.). The report also criticizes the vague and imprecise nature of the skills and abilities to be measured by raters, which would allow various interpretations. (Id. at 14).

19

Seberhagen contends that Schott compounded these problems by failing to offer precise written instructions for evaluators, whose ratings would therefore be inconsistent.  (Id.).  Seberhagen concludes that these weaknesses in the process led to improper discrimination on the basis of sex.  (Id.).

The court finds that Dr. Seberhagen is qualified by "knowledge, skill, experience, training [and] education" to testify as an expert on employee selection methods like the matrix, and that his report represents a proper application of this expertise.  FED. R. EVID. 702.  Seberhagen's expert report applies this skill and knowledge to opine on the discriminatory nature of the matrix's design and implementation.  The court rejects the defendant's argument that Seberhagen's lack of knowledge of specific glassmaking processes precludes him from applying his expertise to the development of the matrix. Seberhagen may not be qualified to determine the proper temperatures at which glass should be heated, but he is qualified to discuss the way that employers should select employees for jobs.  The defendant may, of course, challenge Seberhagen's conclusions based on the specific requirements of glassmaking during cross examination.

### b.  testimony on validation study

Defendant next challenges Dr. Seberhagen's conclusion, asserted in his deposition, that defendant should have performed a "validation study" before implementing the matrix to ensure that the matrix assessed skills that would actually predict performance in the redesigned job.  Defendant seeks to have Seberhagen

20

precluded from testifying to this claim.  Defendant insists that this testimony asserts

that Schott was legally required to perform such a study and should be liable for

failing to do so.  To allow the testimony would lead the jury improperly to conclude

either that failing to conduct the validation study *per se* violated the law, that

defendant needed to perform such a study to prove that the matrix was job-related

and consistent with business necessity, or that the matrix was invalid selection tool.

Not only would such testimony be an improper legal conclusion, but would also

serve to confuse and mislead the jury in violation of Federal Rule of Evidence 403.

A large portion of the defendant's challenge to this particular testimony is a

contention that Seberhagen purports to offer an improper legal conclusion.  An

expert witness generally may not provide legal opinions.  See United States v. Leo,

941 F.2d 181, 196 (3d Cir. 1991) (finding that "it is not permissible for a witness to

testify as to the governing law since it is the district court's duty to explain the law to

the jury.").  An expert witness may, however, be used by the finder of fact to help

unsnarl complicated factual issues.  Federal Rule of Evidence 702 provides, in

pertinent part, that "[i]f scientific, technical, or other specialized knowledge will assist

the trier of fact to understand the evidence or to determine a fact in issue" a fully

qualified expert may testify.  See also United States v. Velasquez, 64 F.3d 844, 849

(3d Cir. 1995) (recognizing "the 'strong and undeniable preference for admitting any

evidence having some potential for assisting the trier of fact' which is embodied in

the Federal Rules of Evidence'" [citations omitted] and noting that "Rule 702, which

governs the admissibility of expert testimony, specifically embraces this policy.").

The court does not take the statements here complained of as legal conclusions, but instead as a criticism of the methods that Schott used to redesign the factory and the adverse impact on women those methods created.  The court has already concluded that Seberhagen is qualifed as an expert to address such issues.  Of course, while Seberhagen may testify as to the usefulness of a validation study under these circumstances, he cannot testify to the legal consequences of failing to undertake that study.  The defendant could certainly interpose an objection if he attempted to do so at trial.  The court recognizes that it has the responsibility for providing the law the jury uses to interpret the facts, and is confident that proper jury instructions will prevent any confusion about how the jury should assess the defendant's construction and use of the matrix.  The court recognizes that defendant contends that Seberhagen's criticism of the matrix process unfairly fails to recognize the financial realities of its business.  The solution to such complaints, however, is for defense counsel to elucidate the weaknesses of Seberhagen's testimony, not preclusion of the testimony altogether.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof," after all, "are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.  A jury can decide whether Seberhagen's opinion is convincing or not following a spirited application of the adversary process.

### c.  qualifications of those designing the matrix

22

Defendant also argues that Dr. Seberhagen should be precluded from testifying that the matrix was unreliable as a means of selecting employees because those who designed the matrix were not qualified by their training to choose employees.  Defendant contends that Dr. Seberhagen here testifies to a legal conclusion and that his report misstates the process of designing the jobs matrix. The persons who designed the matrix had an intimate knowledge of what the jobs required, and provided ratings based on that knowledge.  Their knowledge of industrial psychology or other methods of job selection was irrelevant to the system they constructed to judge employees.  Moreover, Earl Hall, the company's former director of human resources, possesses the sort of formal training Seberhagen claims is lacking in his report.

The argument here appears to be over whether Seberhagen is correct to conclude that the matrix should have been designed by persons with expertise in job classification.  In his report, Seberhagen concludes that "[t]he development and validation of employee selection procedures normally requires formal education in industrial psychology, psychological measurement, job analysis and employee selection.  It is unlikely that any of the Matrix developers had formal education in the development and validation of employee selection procedures."  (Rpt. at 9). Seberhagen reports that he bases this conclusion on the reported education levels of those who designed the matrix.  Defendant disputes that none of the designers had the qualifications that Seberhagen claims is necessary.  In any case, defendant

argues, no legal requirement exists that those designers have to possess such expertise. To claim otherwise–as it asserts Seberhagen has done–is to offer an improper and misleading legal conclusion.

As noted above, the court would reject testimony that offers an improper legal conclusion. Also as described above, such an objection is at this point premature. In any case, the report does not appear to offer a legal conclusion, but instead a criticism of a job classification system that Seberhagen contends was inadequately designed and led to discrimination. Seberhagen may offer an opinion; the court will instruct the jury on what legal conclusions may be drawn from that opinion, if the jury adopts it. Defendant insists that the system was adequate for its purposes and that no discrimination resulted from its use. While the court finds the testimony on this point admissible, defendant may of course dispute Seberhagen's conclusions to the contrary through cross examination or by offering other testimony at trial.

### d.  failure to minimize the matrix's impact

Defendant next contends that Dr. Seberhagen should be precluded from testifying about Schott's alleged failure to minimize the adverse impact of the matrix, since Seberhagen's conclusions on this matter are an inaccurate conclusion about what the law requires. Indeed, defendant insists, Schott would have violated employment discrimination law had it taken action to alter scores and make more women eligible for positions in the reorganized factory. As such, defendant argues that Seberhagen's testimony would convince a jury that defendant's failure to

analyze the adverse impact of the policy was a *per se* violation of the law or that a

legal requirement existed for defendant to find more places for women.  Thus, the

testimony would only confuse and mislead the jury about the legal requirements

defendant faced and should thus be precluded.

The subject of the expert report is the adverse impact that the matrix had on

women.  As part of his report, Seberhagen concludes that "[t]here is no evidence

that Schott made any attempt to minimize the adverse impact of the Matrix by race,

sex, or ethnic group.  There was no discussion of alternative selection procedures

that could have achieved the same purpose with less adverse impact.  Schott did not

even measure the adverse impact of the Matrix."  (Rpt. at 14).  This statement is not

a legal conclusion, but a recitation of the facts as Seberhagen understands them.

The court cannot know, however, that he will testify to a legal conclusion rather than

the facts and analyses contained in his report.  As such, a motion to preclude

Seberhagen from testifying on this issue on such grounds is premature.  Defendant

may object to any legal conclusions that Seberhagen attempts to offer at trial.  The

court is convinced that proper jury instructions will prevent the finder of facts from

being confused about defendant's legal requirements when reorganizing the

workplace.  At the same time, Seberhagen may testify as to the flaws in the

construction of the matrix and the discrimination that he contends resulted from that

construction.  Such testimony will help the jury understand the implications of how

defendant constructed the matrix and reorganized the factory.  With proper

instruction from the court, the jury will use the facts that Seberhagen's testimony has

helped unsnarl the complicated facts surrounding the creation and application of the

matrix.

### ii.  Use of the report in the disparate impact case

Defendant also contends that Dr. Seberhagen should not be allowed to testify

about less discriminatory alternatives to Schott's matrix and melting line operator

selection process as part of plaintiffs' disparate impact case.  As an initial reason for

precluding this portion of Seberhagen's testimony, defendant argues that Dr.

Seberhagen's statistical analysis on the matter is unreliable and therefore

inadmissible.  Defendant argues that Dr. Seberhagen admitted that he improperly

included one worker in his statistical analysis who chose not to bid for one of the

new MLO positions, and that this inclusion alters the outcome of the analysis.

Defendant also argues that Seberhagen offers no reasonable explanation for using

only the top 36 individuals selected for MLO positions, not the 40 who were initially

offered such jobs.  By not including these four workers, who were initially placed on

an on-call list and offered a voluntary severance package but some of whom were

later given jobs as MLOs, Seberhagen's analysis overstates the disparate impact on

women.  Two of the four employees in question were women.  Defendant also

disputes various assumptions made by Dr. Seberhagen in his report, arguing that

the standards he set for which workers were qualified for jobs are arbitrary and

designed to make the defendant look discriminatory.  Defendant contends that

Seberhagen failed to perform an important statistical measure and also asserts that his proposed alternatives are unreasonable.  These criticisms likewise extend to the alternative selection methods Dr. Seberhagen proposes.  All of these failings, defendant insists, should cause the court to preclude Dr. Seberhagen from testifying on disparate impact.

The court finds that all of defendant's criticisms of the report in this context go to whether a jury should find Dr. Seberhagen's criticisms convincing, not whether the report and Dr. Seberhagen's testimony itself is based on sound scientific principles and methodology sufficient to allow the testimony's admission.  The court has found Dr. Seberhagen qualified to testify on the matter, and the parties have a vigorous disagreement about the conclusions the report offers.  The disagreement between the parties here is over whether the report is correct in its conclusions and over whether Seberhagen used the best test avilable.  The court finds that Seberhagen's report is based on sound statistical procedures and methodology.  Since "[t]he grounds for an expert's opinion merely have to be good, they do not have to be perfect," the court concludes that the evidence is admissible, even though subject to the same vigorous challenge that defendant intends to subject other elements of the report.  In re Paoli R.r. Yard PCB Litigation, 35 F.3d 717, 744 (3d Cir. 1994).  As the Third Circuit Court of Appeals has noted, "A judge frequently should find an expert's methodology helpful even when the judge thinks that the expert's technique has flaws sufficient to render the conclusions inaccurate.  He or she will often still believe

that hearing the expert's testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence." Id. at 745.

Defendant also argues that Dr. Seberhagen is not qualified to testify as an expert on whether the alternatives he proposed would meet defendant's legitimate business goals.  Because Dr. Seberhagen has no training in engineering or glass production, he cannot testify as to whether constructing the workforce as he suggests in his alternatives would work to achieve Schott's production goals.  For the same reasons as stated *supra*–that Dr. Seberhagen has extensive experience and expertise in designing, implementing and evaluating employee selection programs and his report employs that expertise to suggest alternative selection methods–the court rejects defendant's contention that Dr. Seberhagen does not qualify as an expert on these matters pursuant to Rule 702.   Defendant may of course examine the limits of Dr. Seberhagen's expertise during cross examination.

### g.  Testimony of Unrelated Incidents of Harassment

Defendant seeks to exclude evidence of what it terms "unrelated incidents of harassment."  (Doc. 94).  The events in question here are a variety of instances in which male workers refused to assist female workers in job training for hot end jobs, made lewd or sexually suggestive remarks, vandalized female workers' possessions, and engaged in other harassing behavior.  Defendant contends that this evidence is unrelated to the claim at hand–that defendant discriminated on the basis of sex in

designing the employment matrix.  Many of the incidents occurred years before the

employment decisions in question, were not brought to the attention of management,

and did not involve supervisory employees.  Defendant insists that these factors

make the evidence irrelevant and inadmissible.  Even if the evidence were relevant,

the defendant contends that it is unduly prejudicial.

The court notes that some of the evidence about which plaintiff complains

concerns the hostility of male "hot end" workers to female workers, and their

unwillingness to train women on the tasks required to work on that end.  The court

finds that such evidence is relevant to the litigation, since plaintiffs claim that they

were unfairly denied access to the newly created MLO position because defendant

constructed the matrix in a way that unfairly valued skills men had over skills women

had.  Thus, evidence that animosity towards women in the workplace and a

pervasive discriminatory atmosphere tended to consign women to jobs that were

later devalued in constructing the new job matrix is relevant.   That evidence has the

potential to make more likely a fact of consequence to the litigation: that factors that

went into the construction of the matrix were shaped by a workplace history of

discrimination rather than the company's legitimate business needs.   In addition, the

probative value of such evidence is not outweighed by the danger of unfair prejudice,

especially for those instances where women were refused training they would later

need to compete effectively on the matrix.

Beyond the fact that the defendant's motion seeks exclusion of relevant

evidence, the motion also suffers from the fact that it is premature and sweeps too broadly.  The proposed order offered by the defendant asks that plaintiffs be "precluded from offering at trial testimony or evidence regarding anecdotal incidents of harassment that are not temporally or logically linked to the selection process for the Melting Line Operator position that is the subject matter of this litigation."  (Doc. 94-2).  Such an order would be impossible to implement at this point, but would instead simply be a general statement on the nature of the evidence which can be presented.  Indeed, granting the motion at this point would have the danger of excluding relevant evidence along with irrelevant evidence.  As explained above, some evidence of harassment and discriminatory attitudes by male workers is relevant to the case.  The court cannot know, however, whether the plaintiffs intend to introduce particular pieces of evidence which are irrelevant to the matter at hand until the time of trial.  The motion will therefore be denied.  This order does not, of course, preclude defendant from offering any considered objections to specific testimony at trial.

### h.  Thomas Luder

Defendant seeks an order from the court precluding Thomas Luder from testifying at trial (Doc. 96).  Luder was a foreman for defendant for thirty years, from 1970 until 2000.  Defendant contends that plaintiffs propose to have Luder testify about incidents that occurred in the 1970s and 1980s and have no relevance to the events at question in this lawsuit.  Much of the testimony that Luder proposes to

offer, defendant insists, consists of inadmissible heresay, rumor, and other events about which Luder lacks personal knowledge.  Defendant contends that all of Luder's testimony would thus be irrelevant and unduly prejudicial.

Luder's testimony on the organization of the production lines, the opportunity of women to learn "hot end" skills, and the hostility of men towards training women in such tasks is relevant to the case.  The testimony could help explain how some workers had the skills valued in the matrix and others did not.  Similarly, Luder, can offer testimony on the way that jobs were organized before defendant altered production methods.  He can likewise testify to the skills required to perform certain tasks.  As explained above, such facts are highly relevant to plaintiffs' discrimination claims.  In addition, the testimony is not unduly prejudicial.  Though some of the facts which Luder could relate are unpleasant facts related to sexually inappropriate behavior, such facts, especially in the context of charges of employment discrimination, often are unpleasant.  The court is confident a jury can make its decision based on the facts of the case, not the emotion elicited by such material.  Finally, this evidence does not constitute improper evidence of "other crimes, wrongs, or acts . . . designed . . . to show action in conformity therewith."  Fed. R. Evid. 404(b).  Instead, the material is circumstantial evidence of the discrimination about which plaintiffs complain.  The court will therefore not preclude Luder from testifying.

At the same time, the court recognizes that plaintiff objects to potential

31

hearsay in Luder's testimony and argues that some of his testimony is temporally unrelated to the issues at hand.  Like all witnesses, then, Luder could potentially offer testimony that is both relevant and irrelevant.  The court concludes that such issues would better be raised during the trial.  If the court were to grant the defendant's motion here, that ruling would sweep up both relevant and irrelevant evidence.  In that sense, defendant's motion is premature.  Accordingly, the defendant is not precluded from objecting to individual portions of Luder's testimony that the defendant has a good-faith basis to believe is inadmissible as hearsay, unduly prejudicial, or irrelevant.

### i. EEOC Determination Letter

Defendant seeks exclusion of the Equal Employment Opportunity's ("EEOC") determination letter regarding plaintiffs' discrimination claims.  (Doc. 98).  Plaintiffs do not oppose the defendant's motion on this matter.  (See Doc. 106).  They agree that the letter is inadmissible.  At the same time, however, plaintiffs contend that they should be able to introduce the statement of Earl Hall, defendant's Human Resources Manager, who asked EEOC investigator Karen McDonough "Why did I have to get the one conscientious investigator at the EEOC?"  The court agrees with the plaintiffs that this statement is admissible.  The statement is not offered for the truth of the matter asserted (that the particular investigator is perhaps the only honest EEOC investigator), but instead could be construed as a question.  In any case, the statement would qualify as one expressing the declarant's "then existing

mental, emotional or physical condition," since it expresses Hall's "intent, plan, motive, [or] design."  Fed. R. Evid. 803(3).  As such, the statement is excepted from the hearsay rule.[3]

**Conclusion**

For the reasons stated above, the court will grant in part and deny in part the parties' motions in limine.

---

[3]The court recognizes that defendant's motion described the EEOC report as rife with hearsay.  Plaintiffs agreed that the report was inadmissible, but still seek to include this statement.  Defendant did not have an opportunity to articulate a reason why the court should exclude the statement.  As such, the defendant may raise this issue at the time of trial without danger of prejudice.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT** | : | **No. 06cv1246** |
| **OPPORTUNITY COMMISSION,** | : | |
| **ARLENE ANDERSON,** | : | **(Judge Munley)** |
| **CAROLYN BLOCKUS,** | : | |
| **LAURA FIGUEROA,** | : | |
| **DEBORAH GDOVIN,** | : | |
| **PATRICIA PAVALONIS, and** | : | |
| **YVONNE PRYWARA,** | : | |
| **Plaintiffs** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **SCHOTT NORTH AMERICA, INC.** | : | |
| **Defendant** | : | |

:::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

**AND NOW**, to wit, this 5th day of February 2009, the parties' motions in limine

are hereby **GRANTED IN PART** and **DENIED IN PART**, as follows:

1) Plaintiffs' motion in limine to exclude any and all reference to Lori Zielinski's

Alleged Sexual Encounter with Robert Zielinski at Defendant's Worksite (Doc.

78) is hereby **GRANTED** as unopposed;

2) Defendant's motion in limine re the effect of Social Security Disability

Income benefits on damages (Doc. 81) is hereby **GRANTED** as unopposed;

3) Defendant's motion in limine re Plaintiffs Gdovin, Moran & Guzik (Doc. 83)

is hereby **DENIED;**

4) Defendant's motion in limine to exclude lay opinion testimony regarding the relative import of cold end tasks (Doc. 85) is hereby **DENIED**;

5) Defendant's motion in limine to exclude stray remarks that are not timely or are purportedly made by non-decision makers (Doc. 87) is hereby **DENIED**

6) Defendant's motion in limine to exclude evidence of the sex discrimination case brought by Judith Luder (Doc. 89) is hereby **GRANTED IN PART** and **DENIED IN PART**.  Plaintiff are precluded from offering any evidence that Luder has filed a sex discrimination lawsuit against the defendant or any evidence about the status of that case.  Plaintiff may, however, discuss facts underlying that case relevant to the instant claim;

7) Defendant's motion in limine to exclude the testimony of Lance Seberhagen is hereby **DENIED** (Doc. 91);

8) Defendant's motion in limine to exclude anecdotal evidence of unrelated incidents of harassment (Doc. 94) is hereby **DENIED**;

9) Defendant's motion in limine to exclude the testimony of Thomas Luder (Doc. 96) is hereby **DENIED**; and

10) Defendant's motion in limine to exclude the EEOC determination letter (Doc. 98) is hereby **GRANTED** as unopposed.

**BY THE COURT**

**s/ James M. Munley**
**Judge James M. Munley**
**UNITED STATES DISTRICT COURT**